JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **BRIGHTK CONSULTING INC.,** on behalf of itself and all others similarly situated, and the general public, | Case No.: SACV 21-02063-CJC (JDEx) |
| **Plaintiff,** | **ORDER GRANTING PLAINTIFF'S UNOPPOSED MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT [Dkt. 43] AND FOR ATTORNEY FEES, COSTS, EXPENSES, AND INCENTIVE AWARD [Dkt. 38]** |
| v. | |
| **BMW OF NORTH AMERICA, LLC,** and DOES 1 through 10, inclusive, | |
| **Defendants.** | |

## I.    INTRODUCTION

Plaintiff Brightk Consulting Inc. brought this putative class action against Defendant BMW of North America, LLC ("BMW NA") and unnamed Does for claims arising out of an alleged defect in the front console cupholder of certain BMW models. (*See* Dkt. 1 [Complaint] ¶ 1.)  Due to the defect, liquid spilled in the cupholders may seep

through and cause damage to the components below the console.  (*See* Dkt. 43 [Notice of Motion and Motion for Settlement Approval of Class Settlement, hereinafter "Mot."] at 10.)  According to Plaintiff, BMW NA's warranty does not cover the costs of repairing damage caused by liquid that seeps through the front console cupholders because the damage is caused by an "outside influence."  (*Id.*)  Plaintiff's Complaint alleges claims for (1) fraud and deceit, (2) breach of express warranty, (3) breach of implied warranty, (4) breach of warranty pursuant to the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1790–95.8, (5) violation of the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750–84, (6) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–10, (7) violation of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500–09, (8) strict liability, and (9) negligence.  (*See* Complaint at 1.)

The parties have reached an agreement to settle the case (the "Settlement Agreement").  Now before the Court is Plaintiff's unopposed motion for final approval of the Settlement Agreement, (*see* Mot. at 1), and unopposed motion for attorney fees, costs, expenses, and incentive award, (Dkt. 38 [hereinafter "Fee Mot."]).  For the following reasons, both motions are **GRANTED**.

## II.    BACKGROUND

Plaintiff initiated this class action on December 16, 2021.  (Mot. at 10.)  On March 28, 2022, the parties requested that the Court enter an order to stay the case pending a mediation scheduled for May 9, 2022.  (Dkt. 17 [Joint Stipulation to Stay Case Pending Mediation].)  The parties were unable to reach a settlement agreement during that mediation, but continued the settlement dialogue until a second mediation session was held on July 12, 2022.  (Mot. at 11.)  At that session, the parties reached an agreement and signed the Settlement Agreement.  (*Id.*)

Under the Settlement Agreement, the class includes "all current and former owners and lessees of a Class Vehicle purchased in the United States, including the District of Columbia and Puerto Rico who do not exclude themselves from (opt-out of) the class." (Dkt. 43-1 [Declaration of Hovanes Margarian, hereinafter "Margarian Decl."] Ex. A [Settlement Agreement, hereinafter "SA"] § 1(HH).)  The phrase "Class Vehicles" refers to the following model year and model BMW brand motor vehicles: 2019–2022 BMW X5 (G05); 2020–2022 X6 (G06); 2019–2022 X7 (G07); 2020–2022 X5M (F95); and 2020–2022 X6M (F96).  (*Id.* § 1(I).)

The Settlement Agreement has two primary benefits for the Class Members.  First, BMW NA will implement an Extended Warranty Period (7 years or 75,000 miles, whichever comes first), during which time any Class Vehicle that requires an Eligible Repair will be repaired by a BMW Center free of charge.  (*Id.* § 3.)  An "Eligible Repair" is a repair performed "to address or remedy a customer complaint of [a supplemental restraint system] warning light illumination and/or damage to other components (if any) below the cupholder that the BMW Center determines or determined was caused by liquid that spilled or that otherwise seeped through the cupholder(s) on the front center console of a Class Vehicle."  (*Id.* § 1(N).)  Second, Class Members who have incurred out-of-pocket costs on such repairs may receive reimbursement after submitting a valid and timely Claim Form.  (*Id.* §§ 4–5.)

The parties also negotiated Class Counsel's attorneys' fees and litigation expenses. They agreed that Class Counsel may apply for an award of up to $375,000.  (*Id.* § 29.) BMW NA also agreed to a service award of $3,000 to Plaintiff in its role as the Class Representative.  (*Id.*)  Both the service award and the attorneys' fees and expenses will be paid separate and apart from any relief provided to the Settlement Class.  (*Id.* §§ 29–30.)

The Settlement Agreement also included a plan for distributing the Class Notice. (*Id.* § 16.)  Within ninety days after receiving preliminary approval from the Court, BMW NA was to email notice to Class Members whose email address was known to BMW NA through its customer database or send notice via First Class Mail when an email address was not available.  (*Id.*)  When updated contact information was required for Class Members, BMW NA was to retain a third party to obtain mailing addresses from the applicable state motor vehicle agencies' registration databases or other available sources.  (*Id.*)  The Claims Administrator was also to establish a Settlement Website, as well as an email address and a toll-free number to provide further information about the settlement.  (*Id.*)

Class Members were able to obtain a copy of the Claim Form via the Settlement Website.  (*Id.*)  A copy was attached to the Class Notice.  (*Id.* § 16(E)(v).)  Claim Forms could be submitted via mail or electronically through the online claim submission portal. (*Id.*)  Each claim required the Class Member to submit a "legible repair order from a BMW Center," "proof of payment," the mileage of the car at the time of the repair, the date of the repair, and "a description of the Eligible Repair performed with indications as to the parts and labor for the repair."  (*Id.* §§ 5(A)–(E).)

Class Members who did not wish to participate in the settlement could opt-out by mailing or delivering a written request to the Claims Administrator.  (*Id.* § 17.)  The Class Notice also provided information about how to object to final approval of the Settlement Agreement.  (*Id.* § 23.)

In exchange for the consideration in the Settlement Agreement, Plaintiff and each Class Member agreed to fully, finally, and forever release, relinquish, and discharge all "Released Claims," including unknown claims.  (*Id.* § 27.)  The "Released Claims" are those that were asserted or could have been asserted by any Class Member against BMW

NA and its related entities in this action related to complaints or concerns that led to or may lead to an Eligible Repair, excluding claims for property damage or personal injury. (*Id.*)

On January 3, 2023, the Court conditionally certified a class and preliminarily approved the Settlement Agreement.  (Dkt. 145 [hereinafter "Order"].)  The claims administrator, Kroll Settlement Administration LLC ("Kroll") then gave notice to the Class Members.  (See Dkt. 43-3 [Declaration of Scott M. Fenwick of Kroll Settlement Administration LLC re:  Class Notice and Claims Received, hereinafter "Fenwick Decl."] ¶¶ 3–6; Mot. at 7.)  The deadline to opt out or object passed on May 18, 2023, and only eight requests for exclusion were received, and no one objected to the Settlement Agreement.  (Fenwick Decl. ¶¶ 10–11; Mot. at 7.)  The deadline to file for reimbursement for out-of-pocket costs passed on August 1, 2023, and 177 timely claims were received. (Fenwick Decl. ¶ 12.)

## III.    DISCUSSION

In deciding whether to grant the motion for final approval and the motion for attorney fees, the Court analyzes (1) whether to certify a class for purposes of settlement, (2) the fairness of the settlement, and (2) the class's response to the notice regarding the Settlement Agreement.

### A.    Class Certification Requirements

A plaintiff seeking class certification must satisfy two requirements under Federal Rule of Civil Procedure 23:  (1) Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy, and (2) the requirement that the action fall within one of the three "types" of classes described in Rule 23(b)'s subsections.  In this case, Plaintiff

seeks certification under Rule 23(b)(3), which allows certification if a court "finds the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The Court previously concluded that Plaintiff presented sufficient evidence to show that the proposed class satisfies the Rule 23(a) and (b)(3) requirements. (*See* Order at 5–10.) Having reviewed those requirements again, the Court adopts its prior analysis regarding class certification and grants certification of the proposed class for settlement purposes only. *See Atzin v. Anthem, Inc.*, 2022 WL 4238053, at *3 (C.D. Cal. Sept. 14, 2022) ("Nothing has change to disturb [the Court's prior] conclusion, and class certification remains appropriate.").

## B.    Class Settlement Agreement Requirements

Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998), a settlement of class claims requires court approval. Fed. R. Civ. P. 23(e). This is because "[i]ncentives inhere in class-action settlement negotiations that can, unless checked through careful district court review of the resulting settlement, result in a decree in which the rights of class members, including the named plaintiffs, may not be given due regard by the negotiating parties." *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (cleaned up).

Approval of class action settlements is governed by Federal Rule of Civil Procedure 23(e). A district court may approve class action settlements only when they are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Courts must consider whether (A) the class representatives and class counsel have adequately represented the class, (B) the proposal was negotiated at arm's length, (C) the relief provided for the class

is adequate, and (D) the proposal treats Class Members equitably relative to each other. *Id.* 23(e)(2)(A–D).

### 1.    Adequacy of Class Representative and Counsel

Plaintiff and Class Counsel have ably represented the class to date. With Plaintiff's help, Class Counsel has conducted significant formal and informal discovery as well as additional investigation related to the cupholder defects. (*See* Margarian Decl. ¶¶ 2–5.) Since this Court conditionally certified a class and preliminarily approved the Settlement Agreement, Class Counsel has endeavored to provide guidance to Class Members and ensured that BMW NA advised dealerships of the Settlement Agreement and their obligations therein. (*Id.* ¶¶ 18–19.)

There is no evidence of a conflict of interest between Plaintiff and the class. Plaintiff's claims are identical to those of the class, and it has every incentive to vigorously pursue those claims. Nor is there any evidence that Plaintiff's counsel, the Margarian Law Firm, will not adequately represent or protect the interests of the class. Plaintiff's attorneys are active practitioners who are experienced in class action and automotive defect cases. (*See id.* ¶¶ 30–34.) And as discussed, the record indicates that Class Counsel has represented the class capable and adequately.

### 2.    Arm's Length Negotiation

The Settlement appears to be the result of arms-length negotiations between the parties. The Settlement Agreement is the product of months of negotiations, (*see id.* at 6), facilitated by an experienced mediator, which increases the likelihood that the settlement was negotiated at arm's length. *See Hashemi v. Bosley, Inc.*, 2022 WL 2155117, at *6 (C.D. Cal. Feb. 22, 2022) ("The parties extensively negotiated the

Settlement over several months prior to mediation and ultimately reached a final agreement only after arms-length negotiations before mediator Mr. Picker."); *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (explaining that although the "mere presence of a neutral mediator . . . is not on its own dispositive," it is "a factor weighing in favor of a finding of non-collusiveness"); *see, e.g.*, *Thompson v. Transamerica Life Ins. Co.*, 2020 WL 6145105, at *3 (C.D. Cal. Sept. 16, 2020) ("The Settlement is the product of extensive negotiations between the Parties with the assistance, and direct supervision, of an experienced and highly-regarded nationally-renowned mediator . . . who conducted a full-day, in-person mediation with all Parties as well as a follow-up mediation telephone conference with all Parties.").

The parties reached this settlement after two lengthy mediation sessions with JAMS Mediator and Special Master Jed D. Melnick, an experienced complex business litigation mediator who has resolved over 1,000 disputes in his career. (*See* Margarian Decl. Ex. C [Declaration of Jed D. Melnick, hereinafter "Melnick Decl."] at 2.) Mr. Melnick also remained involved with the parties' ongoing settlement dialogue after the first mediation was unsuccessful.[1] (*Id.* at 3C.) The Court is satisfied that the negotiation of the Settlement Agreement was conducted at arm's length.

### 3. Adequacy of Relief for the Class

In determining whether the class's relief is "adequate," courts consider "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

---

[1] The Court also notes the mediator's professional opinion after reviewing the parties' "fulsome briefing" and leading two mediation sessions that "[t]he Parties negotiated extensively and at arm's length." (*Id.* ¶¶ 4–5; *id.* ¶ 9 ["The Parties reached agreement on the Proposed Settlement through vigorous and arm's length negotiations during the second mediation session on July 12, 2022."].)

(iv) any agreement required to be identified under Rule 23(e)(3)."  Fed. R. Civ. P.

23(e)(2)(C).  The Court finds the relief reflected in the Settlement Agreement to be

adequate.

### a.    Cost, Risks, and Delay of Trial and Appeal

The Settlement Agreement reflects a substantial outcome for the thousands of

people potentially affected by the defect in the front console cupholder.  The extended

warranty ensures that going forward, Class Members can have any damage caused by the

defect repaired free of charge.  (SA § 3.)  And Class Members who previously incurred

out-of-pocket costs on such repairs will receive reimbursement from BMW NA for those

costs.  (*Id.* §§ 4–5.)  Together, these benefits go a long way towards remedying the past

and future financial injury to Class Members stemming from the defect.

The benefits Class Members will receive present a fair compromise given the

costs, risks, and delay of trial and appeal.  Although the parties have engaged in

meaningful discovery, that discovery has only just begun.  Numerous depositions and

document and other written discovery would be required if the case continued.  Extensive

and expensive expert discovery would also be necessary.  And there would be significant

costs and risks associated with class certification, summary judgment, and trial.  *See In re

Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *3 (N.D. Cal. Nov. 26, 2007)

("Additional consideration of increased expenses of fact and expert discovery and the

inherent risks of proceeding to summary judgment, trial and appeal also support the

settlement."); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6 (N.D. Cal. Mar. 18,

2013) ("The notion that a district court could decertify a class at any time is one that

weighs in favor of settlement." (citation omitted)).  These considerations weigh heavily in

favor of approving the settlement.  *See Rodriguez*, 563 F.3d at 966; *Curtis-Bauer v.

Morgan Stanley & Co., Inc*., 2008 WL 4667090, at *4 (N.D. Cal. Oct. 22, 2008)

("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class."). Even if Plaintiff is able to certify a class, there is also a risk that the Court could later decertify the class. *See In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6 (N.D. Cal. Mar. 18, 2013) ("The notion that a district court could decertify a class at any time is one that weighs in favor of settlement.").

The Settlement Agreement removes all of these costs and risks "by ensuring class members a recovery that is certain and immediate, eliminating the risk that class members would be left without any recovery at all." *Graves v. United Indus. Corp.*, 2020 WL 953210, at *7 (C.D. Cal. Feb. 24, 2020) (cleaned up); *see In re Cobra Sexual Energy Sales Pracs. Litig.*, 2021 WL 4535790, at *6 (C.D. Cal. Apr. 7, 2021).

### b.    Effectiveness of Proposed Method of Distributing Relief to The Class

Next, the Court must consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id.*

Here, the relief distribution is straightforward. Under the Settlement Agreement, Class Members were able to easily complete and submit a Claim Form. Claim Forms were sent out with the class notice and were also available to download from the Settlement Website. (*See* SA § 16; Fenwick Decl. ¶¶ 3–7.) Class Members could mail in

the Claim Form attached to the notice they receive in the mail, mail in a Claim Form downloaded from the Settlement Website, or submit a Claim Form online.  (*See id*.)  177 Class Members did so.  (Fenwick Decl. ¶ 12.)  This procedure for filing claims was not unduly demanding.

### 4.    Attorney Fees and Costs

Next, the Court must consider "the terms of any proposed award of attorneys' fees, including timing of payment," in determining whether the class's relief is adequate.  Fed. R. Civ. P. 23(e)(2)(c).  When reviewing attorney fees requests in class action settlements, courts have discretion to apply the percentage-of-the-fund method or the lodestar method to determine reasonable attorney fees.  *See Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 944–45 (9th Cir. 2011).  For claims-made settlements, the lodestar method is often appropriate; however, courts often conduct a cross-check on the reasonableness of the attorney fee award using the percentage-of-recovery method.  *See Ronald Chintz et al. v. Intero Real Estate Services*, 2022 WL 16528137, at *6 (N.D. Cal. Oct. 28, 2022); *Online DVD-Rental*, 779 F.3d at 949 ("One way that a court may demonstrate that its use of a particular method or the amount awarded is reasonable is by conducting a cross-check using the other method.").  In considering the proposed award of attorney fees, the Court must also scrutinize the Settlement Agreement for three factors that tend to show collusion: (1) when counsel receives a disproportionate distribution of the settlement, (2) when the parties negotiate a "clear sailing arrangement," under which the defendant agrees not to challenge a request for agreed-upon attorney fees, and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class.  *Briseno v. ConAgra Foods, Inc.*, 998 F.3d 1014, 1022 (9th Cir. 2021).

Beginning with the markers of collusion, the Settlement Agreement does have a clear sailing arrangement.  (See SA ¶ 29 ["Defendant does not oppose, and will not encourage or assist any third party in opposing, Settlement Class Counsel's request for attorneys' fees, costs and expenses up to and not exceeding $375,000.00, nor will Defendant contest the reasonableness of the amounts requested under this Agreement."].)  This is not a "death knell" for approval, but rather means that the Court must scrutinize the Settlement Agreement for signs that the fees counsel requests are unreasonably high.  *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 610 (9th Cir. 2021).  Specifically, the Court must "peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class" even when the settlement has been negotiated "with a neutral mediator before turning to fees."  *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021).

The Settlement Agreement also contains the functional equivalent of a reverter clause.  A reverter clause is one "in which [the defendant], not the class members, receives the remaining funds if the court reduces the agreed-upon attorneys' fees."  *Briseno*, 998 F.3d at 1027.  In a common fund settlement with a reverter clause, unawarded fees 'revert' to the defendant rather than being deposited back into the common fund for the benefit of the class.  Here, the Settlement Agreement is structured as a claims-made settlement, meaning there is no common fund and BMW NA will pay out only for the claims that are submitted.  Under that structure, if the Court awards an amount less than $375,000 in attorney fees, the difference is simply money that stays in BMW NA's pocket instead of benefiting the class.  As a result, the Settlement Agreement contains the functional equivalent of a reverter clause.  *See Tait v. BSH Home App. Corp.*, 2015 WL 4537463, at *6 (C.D. Cal. July 27, 2015) ("Although the claims-made settlement does not contain a reverter provision, '[a] claims-made settlement is . . . the functional equivalent of a common fund settlement where the unclaimed funds revert to the defendant.'" (citation omitted)).  Given this structure and the presence of a clear

sailing arrangement, the Court must closely analyze the Settlement Agreement for any signs of collusion.

Plaintiff initially requested an award of "(i) $329,142.50 in attorney's fees for 424.70 hours of work; (ii) a 0.0176 Lodestar multiplier amounting to $5,792.90; (iii) assistant fees amounting to $9,945.00; and (iv) $30,122.60 in costs and expenses incurred by Plaintiff's Counsel for litigating this action; and (2) settlement class representative's service payment in the amount of $3,000.00." (Fee Mot. at 8.) Since the Fee Motion, Class Counsel expended an additional $12,500 to retain an actuary (described below) and conducted an additional 18 hours of work. (Mot. at 18.) Plaintiff now seeks $42,622.60 in costs and expenses and $332,277.40 in fees, including Class Counsel's assistant's fees of $9,945, calculated at the rate of $150 per hour.[2] (*Id.*)

The Ninth Circuit has held that 25% of the fund is the "benchmark" for a reasonable fee award, and courts must provide adequate explanation in the record of any "special circumstances" to justify a departure from this benchmark. *Bluetooth*, 654 F.3d at 942–43; *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) ("We note with approval that one court has concluded that the 'bench mark' percentage for the fee award should be 25 percent. That percentage amount can then be adjusted upward or downward to account for any unusual circumstances involved in this case." (citation omitted)). "If there is no common fund, the Court uses a constructive fund." *Chintz*, 2022 WL 16528137 at *6. As noted above, the Court must look closely at the value of the Settlement Agreement to ensure that there are no signs that the amount requested by Class Counsel is unreasonably high, examining in particular the relationship between attorney fees and the benefit to the class, especially in light of the possibility of

---

[2] The Court finds the rate of $150 per hour for assistant fees reasonable. *See, e.g.*, *Bahra v. Cnty. of San Bernardino*, 2022 WL 6653533, at *8 (C.D. Cal. Sept. 7, 2022) (approving assistant fee rates of $275 per hour, $250 per hour, and $75 per hour); *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 2013 WL 12173894, at *11 (C.D. Cal. Sept. 6, 2013) (approving assistant fee rate of $175 per hour).

reversion and the clear sailing arrangement.  *See McKinney-Drobnis v. Oreshack*, 16
F.4th 594, 610 (9th Cir. 2021).

Plaintiff initially valued the settlement benefit conferred on the class at
$30,600,000.  (*See* Dkt. 34 [Response] at 4.)  It asserted that "a conservative estimated
value of the automatic warranty extension benefit for Eligible Repairs is $30,000,000."
(*Id.*)  To reach this figure, Plaintiff pointed to a typical 7 year/75,000-mile warranty
extension for a BMW X7, which costs $5,279 if purchased in the marketplace.  (*Id.* at 3.)
That warranty, however, covers multiple systems, while the warranty extension under the
Settlement Agreement is limited to the Eligible Repairs; therefore, Plaintiff offered a
value of 1/50th of the price ($100) for the approximately 300,000 Class Vehicles.  (*Id.* at
4.)  Because Class Members "will get th[e] warranty extension benefit automatically
added to their cars without having to claim it," (*id.* at 3), Plaintiff asserted that the value
of the warranty extension should not be viewed on a claims-made basis.  Plaintiff also
asserted that based on "information adduced in confirmatory discovery," the estimated
value of the reimbursement benefit is $600,000.  (*Id.* at 4.)

In response to concerns raised by the Court that the $30 million valuation was
excessive, (see Order at 18–19), Plaintiff offers a revised valuation of between $2.42
million and $4.72 million.  (Margarian Decl. ¶¶ 20–22.)  Plaintiff's new valuation is
based on an analysis conducted by Lee M. Bowron, an actuary with over 30 years of
experience whose firm specializes in extended warranty and vehicle service contracts.
(*See id.* Ex. B [Declaration of Lee M. Bowron, hereinafter "Bowron Decl."].)  The
analysis demonstrates that, conservatively, without this settlement, Class Members would
be forecast to pay approximately $2.3 million to $4.5 million.  (*Id.* at 3–4; *id.* Ex. II.)
The Court is satisfied by the analysis, which relies on an average repair cost of $1,625, a

figure provided by BMW NA.[3]  (*See id.* Ex. II.)  Class Members claimed a total of $223,655.70[4] in reimbursement for out-of-pocket expenses.  (Fenwick Decl. ¶ 12.) Adding that sum to the value of the extended warranty, the Court thus finds Plaintiff's revised valuation of between $2.42 million and $4.72 million reasonable.  *See Lowery v. Rhapsody Int'l, Inc.*, 75 F.4th 985, 992 (9th Cir. 2023) ("[C]ourts must consider the actual or *realistically anticipated* benefit to the class—not the maximum or hypothetical amount—in assessing the value of a class action settlement.") (emphasis added).  The $332,277.40 requested in fees constitutes 13.73% of the lower amount, and therefore appears reasonable.  (*See* Mot. at 18.)

Performing a lodestar cross-check confirms the reasonableness of the percentage award.  Courts commonly perform a lodestar cross-check to assess the reasonableness of the percentage award.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("Calculation of the lodestar, which measures the lawyer's investment of time in the litigation, provides a check on the reasonableness of the percentage award.").  Class Counsel initially submitted evidence of a lodestar fee of $329,142.50 because he spent 424.70 hours at a reasonable hourly rate of $775.  (*See* Fee Mot. at 19.)  Class Counsel sought a .0176 multiplier on the lodestar based on the quality of representation, the benefit obtained for the class, the complexity of the issues presented, and the risk of nonpayment.  (*Id.* at 22–29.)  Since filing the fee motion, Class Counsel has expended an additional $12,500 and worked an additional 18 unanticipated hours.  (Mot. at 18.)  With those adjustments in mind, Class Counsel's new requested rate is $728.33 per hour.  (*See id.*)

---

[3] Between March 31, 2023 and August 14, 2023, BMW NA has already "received a total of 131 claims from dealerships across the United States for Eligible Repairs, for a claimed total cost of $211,353.57." (Dkt. 43-4 [Declaration of Meredith Schank] ¶ 4.)

[4] As of August 14, 2023, Kroll was still in the process of reviewing and validating Claim Forms. (Fenwick Decl. ¶ 12.)

The Court has reviewed the information provided and concludes that the requested amount fairly compensates the attorneys in this case, given the result they achieved for the class and the work reflected in the information provided.  Indeed, the initially requested multiplier may have been appropriate.  *See In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997) (explaining that comparing the lodestar fee to the 25% benchmark "resembles what lawyers commonly do when they draft a bill based on hours spent, consider the bottom line as compared with the value of the result, then cut the bill if the total seems excessive as compared with the results obtained"); (Fee Mot. at 22–29).  Now, no multiplier is sought.  The Court also finds the requested costs and expenses reasonable.  (*See* Dkt. 38-1 [Declaration of Hovanes Margarian] Ex. B at 78 [requesting $15,925.00 in costs for mediation services and $14,197.60 in costs for expert fees]; Margarian Decl. ¶ 29 [requesting an additional $12,500 in costs for expert fees]; Mot. at 18.)

After examination of the requested fees, the "clear sailing" arrangement and the reverter clause do not suggestion collusion.  Because the Settlement Agreement does not use a common fund, the fee award will not reduce the benefits to the Class, which, in conjunction with the reasonableness of the fees sought, mitigates collusion concerns.[5]  See *Roberts v. Electrolux Home Prod., Inc.*, 2014 WL 4568632, at *14 (C.D. Cal. Sept. 11, 2014) ("[T]he Court notes that this Settlement does not involve a common fund apportioned between relief and fees—and the attorneys' fee award will not reduce any benefits received by the Class."); *Eisen v. Porsche Cars N. Am., Inc.*, 2014 WL 439006, at *10 (C.D. Cal. Jan. 30, 2014) ("The Settlement Agreement merely provides that PCNA will not object to a fee petition by plaintiffs' counsel so long as the requested fees and costs do not exceed $950,000. This type of provision is appropriate when, as here, it does

---

[5] It is also noteworthy that "[t]he Parties did not negotiate the Plaintiff's attorneys' fees, expense reimbursement, or service awards for Plaintiff during the aforementioned mediation sessions until after all settlement terms for the Class had been agreed upon."  (Melnick Decl. ¶ 10.)  This further suggests that any fees did not come at the expense of Class Member benefits.

not impact the substantive benefits offered to the class.").  Similarly, the reverter clause is less indicative of collusion than may be typical.  The primary benefit of the Settlement Agreement is the extended warranty.  Class Members who have already incurred out-of-pocket costs on repairs were further eligible to receive reimbursement.  As has already been discussed, the Settlement Agreement does not use a common fund.  Thus, "distributing 'unclaimed' funds to the Class would result in many Class Members receiving a windfall for injuries they never suffered—and thus lack standing to prosecute."  *Hashemi*, 2022 WL 18278431, at *7.

In addition to the amount of counsel's fees and costs, the Court must also scrutinize the timing of payment.  *See* Fed. R. Civ. P. 23(e)(2)(c); *see also Salas Razo v. AT&T Mobility Servs., LLC*, 2022 WL 4586229, at *13 (E.D. Cal. Sept. 29, 2022) ("[C]ounsel will receive payment at the same time as Class Members, and the timing of payment does not weigh against preliminary approval of the Class Settlement.").  Here, the Settlement Agreement provides that Class Counsel will be paid no later than thirty days after the Effective Date.  (*See* SA § 31.)  That date is in advance of when Class Members can expect to be reimbursed for their out-of-pocket expenses.  (*See id.* § 15 [providing that "[s]tarting sixty (60) days after the Effective Date, the Claims Administrator will issue checks on a rolling basis for approved and validated Claims"].)  This could cast a slight shadow on the proposed fee and cost arrangements.  *See, e.g.*, *Razo v. AT&T Mobility Servs., LLC*, 2022 WL 4586229, at *13 (E.D. Cal. Sept. 29, 2022) ("[C]ounsel will receive payment at the same time as class members, and the timing of payment does not weigh against preliminary approval of the Class Settlement.").  However, especially given the strong showing of arm's length negotiation and lack of collusion in this case, "the gap between payments does not appear so significant as to weigh against approval of the Class Settlement."  *Martinez v. Semi-Tropic Coop. Gin & Almond Huller, Inc.*, 2023 WL 3569906, at *19 (E.D. Cal. May 19, 2023).

### 5.    Any Agreement Required to Be Identified Under Rule 23(e)(3)

The Court must also consider whether there is "any agreement required to be identified under Rule 23(e)(3)," Fed. R. Civ. P. 23(e)(2)(C)(iv)—that is, "any agreement made in connection with the proposal," *id.* 23(e)(3).  The parties have not identified any agreements other than the proposed Settlement Agreement.

### 6.    Equitable Class Member Treatment

The final Rule 23(e) factor turns on whether the proposed settlement "treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2).  "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

Under the Settlement Agreement, Class Members may receive differing payouts depending on what documentation they have of their out-of-pocket costs.  This difference in treatment is appropriate and reasonable.  Further, "each Class Member will receive automatic benefits under the Agreement (in the form of a warranty extension)."  (Dkt. 31 [Motion for Preliminary Approval of Class Settlement] at 19.)  The release is also the same for all Class Members.  (*See* SA § 27.)  The Court finds that the Settlement Agreement treats Class Members equitably.

### 7.    Class Representative Incentive Award

Next, the Settlement Agreement provides for an incentive payment to the Class Representative "not to exceed three thousand dollars ($3,000.00)."  (*Id.* § (1)KK.)

Incentive awards are payments to class representatives for their service to the class in bringing the lawsuit.  *See Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013).  Such awards "encourage individuals to undertake the responsibilities and risks of representing the class and recognize the time and effort spent in the case."  *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *30 (N.D. Cal. Aug. 17, 2018).  Courts routinely approve this type of award to compensate representative plaintiffs for the services they provide and the risks they incur during class action litigation.  *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009); *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 499 (E.D. Cal. 2010).  In the Ninth Circuit, a $5,000 incentive award is "presumptively reasonable."  *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015); *see also Harris v. Vector Marketing Corp.*, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) (collecting cases and explaining that in the Ninth Circuit, $5,000 is a presumptively reasonable service award).  Incentive awards in this district typically range from $3,000 to $5,000.  *See In re Toys R Us-Del., Inc.-Fair & Accurate Credit Transactions Act Litig.*, 295 F.R.D. 438, 470 (C.D. Cal. 2014) (collecting cases).  When evaluating the reasonableness of incentive awards, courts consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions," and the time the plaintiff spent pursing the litigation.  *Staton*, 327 F.3d at 977.

Plaintiff asserts that the incentive award will compensate it for its work consulting with Class Counsel, "providing [its] experience and relevant documents," "providing the Subject Vehicle for inspection," "reviewing the complaint prior to filing, "assist[ing] . . . with fact development and discovery," "regularly communicat[ing] with the Class Counsel to remain up to date," and "review[ing] the settlement terms discussed during the mediation sessions and during the negotiations."  (Dkt. 43-2 [Declaration of Fang Lin] at ¶¶ 5–10.)  Plaintiff's requested incentive award appears reasonable given the work it performed on this case.  *See Aarons v. BMW of N. Am., LLC*, 2014 WL 4090564, at *19–

20 (C.D. Cal. Apr. 29, 2014) (awarding $3,500 to named plaintiff who "provided documents to Class Counsel; reviewed pleadings and court filings; participated in mediation sessions; visited Class Counsel to discuss the case; and evaluated the proposed settlement."). Accordingly, the Court approves the requested $3,000 incentive award.

In sum, based on the Rule 23(e)(2) factors, the Court concludes that the Settlement Agreement is "fair, reasonable, and adequate."

### C.    Response to Notice

Consistent with the Settlement Agreement, Kroll, on behalf of BMW NA, emailed notice to Class Members whose email is known to BMW NA and sent notice via First Class Mail when an email address was not available or was rejected/bounced back as undeliverable. (Fenwick Decl. ¶¶ 3–6.) Kroll used a third-party locator service for those addresses which were returned as undeliverable and sent notice to the addresses identified by the service. (*Id.* ¶ 9.) Kroll also updated a previously established settlement website on which Class Members could submit a claim form, review a FAQ, view a copy of the notice, and obtain relevant contact information, including an email and toll-free number. (*Id.* ¶ 7.) Kroll received 177 timely claims. (*Id.* ¶ 12.)

Kroll received only eight requests for exclusion, and no one objected to the settlement. (*Id.* ¶ 10–11.) This indicates very strong overall support for the Settlement Agreement and supports final approval. *See, e.g.*, *Hashemi*, 2022 WL 18278431, at *6 ("Very few objections and opt-outs create a strong presumption that the Settlement is beneficial to the Class and thus warrants final approval."); *In re Lifelock, Inc. Mktg. & Sales Practices Litig.*, 2010 WL 3715138, at *6 (D. Ariz. Aug. 31, 2010) (explaining that low number of timely written objections and requests for exclusion supported settlement approval); *National Rural Telecommunications Cooperative v. DIRECTV, Inc.*, 221

F.R.D. 523, 529 (C.D. Cal. 2004) ("The absence of a single objection to the Proposed Settlement provides further support for final approval of the Proposed Settlement.  It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiff's motions for final approval of the Settlement Agreement and for attorney fees and costs are **GRANTED**.

DATED:    September 12, 2023

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE